here argument in case number 21-25-22, Bhatti v. Physicians Affiliate Group. Good morning judges. May it please the court. Appellant filed this action in response to The district court found on summary judgment that appellant did not sufficiently evidence that defendants had notice of her protected activity. Appellant engaged in protected activity in the form of an EEOC complaint and a lawsuit against a predecessor company. During the district court's decision noted that Dr. Letungi's denials that he was aware of the EEOC or the prior lawsuit showed that there was no evidence that they would have notice of the discriminatory complaints. However, a jury can find that the circumstances evidence knowledge of the protected activities even when an agent denies it and was respectfully submitted that here the circumstantial evidence finds that Dr. Letungi did have knowledge of the protected activities. And that knowledge comes from three places or the circumstantial evidence. First, Dr. Letungi made several misstatements on other relevant matters that tended to downplay or lessen his role and the effects on appellant. Second, Dr. Letungi was mentioned 20 times in this prior lawsuit, which was answered and discovery was engaged, some discovery was engaged in. And thirdly, the timing of defendant's actions in relation to the protected activities. When all three of these are taken together, they provide sufficient evidence the defendant had notice of appellant's protected activities. On the second point, can I ask you, did you depose Dr. Letungi? Dr. Letungi was not deposed in the first case. So no opportunity to, well, no opportunity taken to cross him on the points. I mean, he denied knowledge. So you would have presumably crossed him on the points about his being named in the lawsuit, etc. Oh, I apologize, Your Honor. I misunderstood you. He was deposed in the second action. Yes, in this action, he was deposed. Okay. And did you cross him on these issues? He flatly sort of denied that he had any involvement in these issues. With respect to the prior lawsuit, no matter what we asked him, it was simply he didn't have any knowledge of it. He steadfastly denied it. So he was certainly asked about those during his deposition. He was asked if he was consulted, obviously cautious about attorney-client privilege, but ways to do that to ask if he was consulted before the filing of the answer, anything like that? Yes, he was asked. He denied it. I would like to add that it wasn't just that an answer was filed in this case, in the previous case, and it was settled. The answer was submitted by defendants. Again, he was mentioned in his specific retaliatory actions were mentioned in the lawsuit. So it would have been sort of impossible for defense counsel, prior defense counsel, it's not the same firm, prior defense counsel to do what they were supposed to do in terms of answering the case without learning about these specific incidents. They also submitted substantial paper discovery in this case, in the previous case. And they also, excuse me, in addition, we appeared for initial conference and there were initial disclosures. They identified Dr. Letungi as a witness, which again, without speaking to him, it would be hard to know whether or not he actually witnessed anything. Can you point in the answer, you made a generalized point, but can you point to any particular response that you think allows for the inference that he must have been, I suppose there's two inferences you're asking the court to make, that he was consulted before the response could be provided, and that in that consultation he was made aware of who was suing, right? That's a slightly separate inference, I suppose. That is correct, Your Honor. That would be two actual inferences, yes. I don't have the paragraph numbers, but in the complaint it was alleged that after the EEOC complaint, Dr. Letungi wouldn't send Dr. Bhatti to training, then he started disciplining her. These are specific allegations that Dr. Letungi took that they would have to respond to, at least ask him about, prior to submitting an answer. Let me ask you a question. Isn't the claim that the retaliation began in December 2014? That's when negative evaluations were given. Yes, yes. Yes, that is. The first negative evaluation was part of the prior lawsuit, so that's not retaliation necessarily for this case. However, it does evidence the retaliation and that Dr. Letungi was aware of the prior EEOC and the prior lawsuit. Why do negative evaluations evince awareness of an EEOC claim having been filed? Certainly. Plaintiff had worked there for 14 years. There was never a negative evaluation. There were stray comments two or three times throughout those 14 years where it was said that she could be a better team player, she needs to work on her communication skills. Or that she was very difficult to work with. Yes, or that she was difficult to work with. Yes, that's correct, Your Honor. But there were these sparse comments throughout 14 years. None of the evaluations are lower than average. There's no counseling memorandums. There's no disciplinary memorandums. As a matter of fact, Dr. Letungi was her supervisor for three or four years prior to the negative evaluation. In all of those evaluations, there's no comments about her communication skills or being difficult to work with until she filed the EEOC complaint. There's no negative evaluations. There's no negative disciplinary actions. He says, Dr. Letungi had said and testified, that he had these issues almost from the beginning. But he takes no action for almost four years until the time comes when she files complaints. Then all of a sudden, these same actions, and he admits that they were to the same degree, to the same level, all of a sudden these actions warrant negative evaluations, comments in the evaluation, the two disciplinary counselings, and ultimately her termination. So the only thing that materially changed was her complaints. He says that her issues were to the same degree they were all along. He said he had these issues from almost the start of her employment with her, which was in 2010 is when he became her supervisor. This was your third point, the temporal proximity argument? Excuse me? This is your temporal proximity argument? Yes, yes. And can you break that down for me? What's the specific timing? Absolutely. December of 2014, how many months are we talking about? So there's a couple of different issues here, so I'm just going to try and break them down briefly. In April 18th of 2014, she files her EEOC complaint. On July 23rd, three months later, she receives the first counseling memo. A month after that, she's issued her second counseling memo. Dr. Bowdy files her federal lawsuit in August 28th of 2015. Three months later, in November, the first evaluation she receives that rates her below average and her communication skills are rated unacceptable. And then a month later, a defendant elects not to hire her based on the information provided by Dr. Latunji. But then does hire her? Eventually does hire her with restrictions that other people were not subjected to, yes. That is correct. And then in terminating her, they use the information that is provided specifically by Dr. Latunji again. And it was the same level as it was back in 2010-2011 by Dr. Latunji's own admission. Is there any evidence that you rely on other than the timing? Any affirmative evidence that you rely on other than the timing? Judge, it's circumstantial. It's the timing combined with the misstatements combined with the prior action. It's all of it put together. I don't think one thing would necessarily carry the day. But when you look at all the circumstantial evidence in its totality, that is what we argue a reasonable jury can find. What misstatements are you referring to? Certainly. During his deposition testimony, Dr. Latunji stated first that he was not involved or consulted as to whether a appellant should be hired when PAGNY or a physician's affiliate group took over the contract. Okay. What was the timing of that hiring? That was in the December. That was after the federal lawsuit is when this decision was being made. So after the summer of 2015? Yes. So why does that show what knowledge he had in December 2014? Certainly. Well, again, what it goes to show is that that combined with other statements such as that he didn't know how Dr. Batty's employment ended, even though he was involved in the decision to terminate her. When did it end? December of 2016. So how does that show what he knew in December 2014? Certainly, Judge. It's the same question as you asked previously. I apologize for not answering it correctly. I was getting there. Just a year apart. I apologize. Yes. What it shows is that Dr. Latunji tends to make incorrect statements that lessen PAGNY and his liability, whether they're accurate or not. He says things that are direct conflict with Dr. McDonald that lessens his liability or his involvement. He continually made statements that lessened his role in this matter. And we would argue just like he did with saying that he never received this. Thank you very much. Go ahead. Sorry. Just briefly on, I know it wasn't the basis below, but on causal connection, can you, on the final prima facie factor, could you walk us through what you would argue to the jury based on this record would establish causal connection? Absolutely. Certainly. And causal connection is very closely aligned here with the timing argument in terms of notice. It's sort of very similar. Again, she worked there for 14 years. There are no discipline, no issues, no below average on her ratings whatsoever. There are certainly remarks, three of them, relating to her being difficult to work with or a team player. But she suffered no negative consequences as a result of that. They were sporadic throughout the course of 14 years. Dr. Latunji becomes her supervisor. First year rates are outstanding. Then gives her average ratings. Nothing below average. No comments about her communication skills despite saying that he had these issues. There's no documentation to indicate that he did prior to her making the complaints. She files the EEOC complaint. And then within three months, for the first time, she's receiving negative evaluation in terms of teamwork. She's also receiving counseling memos for the first time. Then she's not rehired. Sorry. Then she files her lawsuit. Then within three months, she receives a negative evaluation. And based upon that information, isn't rehired. So we believe that the timing is very strong in that respect. Okay. Thank you. Thank you. Mr. Young. Good morning, Your Honors. May it please the Court. Philip Young here on behalf of PAGNY, Physician's Affiliate Group. I want to begin by emphasizing here that regardless of whether Batty has established a prima facie case of retaliation, this Court can easily affirm on an alternative ground here. PAGNY proffers legitimate, highly credible reasons for disciplining and then eventually firing Batty. She was just a bad employee. The record is consistent and basically overflowing with evidence that she was a bad employee. She fought with her supervisors. She refused direct orders to complete tasks. She refused to see certain patients. Even when she did see them, she would delay for over an hour while she completed less pressing paperwork. She acted in a rude and abrasive manner to her colleagues. I suppose your opposing counsel's argument is there's none of that in the record prior to the filing of the EEOC charge. What's your response to that? My response, Your Honors, is that there is evidence of that. Batty began employment with Verizon in 2001. And starting in 2002, she began to get comments on her evaluations that noted that she was an extremely difficult person to work with. She was in conflict with her supervisor and would do well to try to fix that problem. She received, I don't know the distinction between a counseling memo and a discipline memo, but she did receive a counseling memo in 2008 that was a result of communication issues with her supervisor. And she was eventually transferred in 2010 to the new unit where Latunde was her supervisor, again, because of communication issues and conflict with her supervisor. Do you have a record cite for the 2008 counseling memo? 2008. Give me one second, Your Honor. It's okay. It should be in our brief, Your Honor. So, to your point, these issues did arise prior to the EEOC complaint and lawsuit, and Corizon had concerns about them and addressed them in disciplinary memos and things like that. And the record also shows that these issues and discipline problems gradually got worse over time. The discipline that she was subjected to in 2014 was in response to a very specific incident in July where she refused to complete a task called Bing rounds that requires going around to all of the inmates in Rikers or in the unit and checking to see if they had any medical complaints. You know, all of these disciplinary memos and negative performance evaluations were in response to just increasingly negative, difficult problems that Batty had, you know, interacting with her colleagues, communicating, teamwork, and all of that evidence is just overwhelming legitimate, non-retaliatory reasons that Pagny had for disciplining and later firing Batty. And I want to also reiterate that Pagny gave her a second chance. You know, they hired her for a one-year probationary period subject to these quarterly evaluations, which were designed to help her sort of improve her teamwork and communication skills. They held meetings with her to talk with her about these problems, and she never improved. I mean, Dr. McDonald at Health and Hospital expressed frustration in multiple points about how she seems unable to reflect on what she's doing wrong. And so after all of this, after a year of giving her a second chance, and there were no noticeable improvements in her performance, Pagny then fired her. Could you address the appellant's argument about Dr. Litungi's knowledge that he must have known in light of the sort of pervasive mentions of his name in the caressing complaint? Sure, Your Honor. So there's simply no evidence in the record, as Judge Nathan noted, that Litungi was ever consulted about this lawsuit or about this answer. I don't believe that he was- on his affirmative denial of knowledge, such that a jury could reach the conclusion of knowledge. No, Your Honor. I don't think a reasonable inference is available because there's just- the record is just really devoid of any evidence about Litungi talking with Corison about this. Well, typically when a company gets sued and there's allegations about a specific employee's conduct, that individual is consulted with the legal team in preparing a response. I think that would be sort of the inference. I agree that that's certainly true, Your Honor. But here there were just no questions posed to Litungi at his deposition about that issue, as far as I'm aware. I think it was a question, you know, did you know about this lawsuit? And he said no, and that was sort of it. There's nothing else in the record that a juror could look to other than, you know, attorney argument about what this answer must have meant that would allow them to reach the conclusion that Litungi knew. And, you know, that's bolstered by other evidence in the record. Litungi wasn't a named party in the EEOC complaint. Batty admitted that she never talked to him about the EEOC complaint. Were there any allegations of acts that he performed in that complaint? In the EEOC complaint, no. No, not in the EEOC complaint. In the complaint to which an answer was filed after. Yes, Your Honor. In the lawsuit, there were allegations directly against Litungi. That's correct. And he was a named defendant in that? No, he was not, Your Honor. It was just against Corizon. Okay. And so I think just briefly to respond to counsel's points regarding causation here. Let me ask you one more question about the answer to the complaint against Corizon. With respect to allegations as to things that Dr. Litungi did, were the responses denials or denials of information sufficient to form a belief? Candidly, Your Honor, I don't know the answer to that question. I'm not certain whether or not that answer was even in the record. But I can certainly get that information for you. And then just finally briefly on the issue of causation, I just want to point out here that the defendant is Pagny, not Corizon. And so the relevant adverse employment actions are Pagny's adverse employment actions, which took place in 2016 with the two negative performance evaluations and then the eventual firing in December 2016. It's those adverse employment actions that are the relevant actions for testing whether there's a causal connection to the EEOC complaint and lawsuit. And the temporal gap there is very long, many months, often even years, between the EEOC charge and lawsuit and Pagny's adverse employment actions. So on that theory, the temporal proximity could go to show Litungi's knowledge, but it's a much larger gap with respect to, if you're thinking about this as causal connection, between Pagny's adverse action and the protected conduct. Yes, that's correct, Your Honor. Since Pagny is the defendant here, the adverse employment actions that matter are Pagny's. And the gap between Pagny's actions and the protected activity here are just too great. And just one more point there. This really does go to causation only. This doesn't go to the knowledge element. The knowledge element has to be established first. And only once you can establish that with sort of independent evidence, are you then justified in using temporal proximity evidence to infer causation. If there are no further questions, Pagny will rest on its briefs. Thank you, Your Honors. Thank you, Counselor. Mr. Marks, you have three minutes. Yes, I will try to be brief because I know we went over the first time. Something that opposing counsel said with respect to Dr. McDonald, he indicated that Dr. McDonald expressed frustration that Dr. Boddy was not improving, as part of these two evaluations. The important thing is Dr. McDonald never witnessed any of these interactions. He received his information specifically from Dr. Latungi, the same person who Dr. Boddy has been complaining has been retaliating against him now for years at this point. Dr. McDonald believed that Dr. Boddy's clinical work was, quote, unquote, very good. He believes she's a good clinician. There's been no debate about that whatsoever. Dr. McDonald received all of the information regarding alleged deficiencies with Dr. Boddy's performance directly from Dr. Latungi at that point for those evaluations. So I think that's an important point to note. And one other point that opposing counsel made with respect to Dr. Boddy not improving, not getting better, getting worse, in fact. Dr. Latungi testified during his deposition that the issues he experienced at Pagny were the same exact issues to the same degree as they were at Karazin. So this is not an issue where she was getting worse despite counseling or despite memorandums. She was doing exactly the same thing, which, again, did not lead to any discipline prior to her filing any complaints. If there's no further questions, I will rest on my brief. Can I just add, you and opposing counsel disagreed. I had asked in the deposition was Dr. Latungi asked whether he was consulted in any way prior to filing the answer. And I think you said that he was and he denied it. I understood opposing counsel to say he denied general knowledge but wasn't asked that. Are you confident of your answer? My recollection, Judge, if I may, and I appreciate you giving me a chance to respond to that because I meant to. My recollection is that he was asked a follow-up question. I don't think it was as extensive as I would like, but I believe he was asked a follow-up question. Did he speak to anyone about the lawsuit as well, which would imply that. But it wasn't. It was not. And if I gave the impression that it was some sort of longer substantive drilling down during the deposition, I apologize. That was not my intent. Could you give us a citation to the appendix where we could take a look at what was actually asked? I apologize, Judge. I don't have that in front of me. I could certainly provide that. Thank you very much. Okay. Thank you both. We'll take the case under advisement. That concludes our arguments for today. So I will ask the Court to defer. Thank you, Judge.